Arthur JACKSON, et al.,
Appellants/Cross–
Appellees,

v.

Richard N. SCOTT, M.D., et al.,
Appellees/Cross–Appellants.

Nos. 94–CV–376, 94–CV–429.

District of Columbia Court of Appeals.

Argued Nov. 16, 1995.
Decided Dec. 11, 1995.

Elizabeth A. Karasik, with whom Dean E. Swartz and Richard J. Mudd were on the brief, for appellants/cross-appellees.

D. Lee Rutland for appellee/cross-appellant Richard N. Scott, M.D.

Albert Brault, with whom J. Joseph Barse and Rhonda A. Hurwitz were on the brief, for appellee/cross-appellant Washington Hospital Center.

Mark Lightfoot, with whom Gary A. Godard and Edward A. Gonsalves were on the brief, for appellee/cross-appellant Arthur B. Lee, Jr., M.D.

Before FERREN, FARRELL, and REID, Associate Judges.

FARRELL, Associate Judge:

A jury found against the plaintiff-appellants in this medical malpractice action, concluding in response to special interrogatories that defendant Richard N. Scott, M.D. was not negligent in performing cardiac surgery on Willard M. Jackson and that, accordingly, defendant Washington Hospital Center (WHC) was not liable to the plaintiffs for alleged negligence in granting Dr. Scott medical privileges. On appeal, the plaintiffs assign multiple claims of error but agree that if the court resolves one cluster of issues against them, the other claims are moot.[1] The decisive questions concern rulings by the trial court sustaining application of a statutory peer review privilege to findings and information contained in the so-called "Bacos report," which set forth the results of an investigation by WHC into the cardiac surgery performed in this and other cases. The report reflected unfavorably on Dr. Scott and the assisting surgeon in this case, Dr. Arthur B. Lee, Jr.,[2] and lent support to the plaintiffs' theory that Mrs. Jackson had died from uncontrolled surgical bleeding.

We hold that the broad statutory privilege against divulgence of medical peer review reports and related information in (among other things) civil judicial proceedings barred the admission of the findings and factual information in the Bacos report. As the trial court committed no error in excluding this proffered evidence, we sustain the judgment in appellees' favor.[3]

## I.

Willard M. Jackson, the wife of appellant Arthur Jackson, died following open heart surgery at WHC on August 26, 1980. The death certificate, signed by Dr. Scott who had performed the surgery, stated the cause of death as "left ventricular failure." In late 1980 or early 1981, WHC formed an ad hoc committee of doctors to review the cardiac surgical deaths at the hospital during a six-month period in 1980. Willard M. Jackson was one of fourteen patients whose cases were chosen for review. Dr. James M. Bacos, Chief of the Department of Cardiology and head of the committee, issued a written report on February 12, 1981 (the Bacos report). In a finding which the parties agree referred to the Jackson case and one other, the report pointed out that "[t]he predominating factor which resulted in a patient death" was the "[f]ailure to maintain appropriate life support systems during surgery." Attached to the report was a written statement or factual summary describing the Jackson surgery as follows:

> During cannulation a hole was made either on the posterior aspect of the aorta or the pulmonary artery; unable to maintain adequate flow thru entire case. At end of case found that the patient was bleeding from neck; entire OR table was soaked with blood. Swan had been put in pre-op in ICU; had to be taken out in OR because it was improperly placed. Bleeding was not adequately stopped at this site.

> 10 units of blood + all other fluids transfused during perfusion.

> Dr. Scott's partner assisted on this case. Between the two of them, case was very mismanaged.

In their brief, appellants concede that this statement was made to the committee by "a member of the surgical team who had been present during Mrs. Jackson's surgery *and reported observations to the committee*" (emphasis added). This accords with Dr. Bacos' testimony out of the presence of the jury that the information in the summary had been "provided to us by somebody in the surgical department" who "had to [have been] in the operating room at the time of

---

1. The sole exception to this concession is the argument in the plaintiffs' reply brief that this court should overrule precedent and adopt civil conspiracy as an independent tort. *See Griva v. Davison,* 637 A.2d 830, 848 (D.C.1994). We decline to do so. *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971).

2. The trial court granted summary judgment to Dr. Lee, a ruling also challenged on appeal and governed, except as stated in note 1, *supra,* by our disposition of the peer review issues.

3. We accordingly need not consider the issue raised by appellees' cross-appeal.

the surgery."[4]

Dr. Scott's privileges to perform surgery at WHC were later suspended until further notice, and as a result of litigation between Dr. Scott and WHC, he resigned his staff privileges at WHC in 1982.

The Jackson family first learned that negligence had possibly caused the death of Willard M. Jackson in 1988 from a newspaper article discussing the investigation of Dr. Scott's practice at WHC. They filed suit against Dr. Scott, Dr. Lee (the assisting surgeon), and WHC in 1989. The trial court issued a series of rulings affecting use of the peer review documents under the then-existing Medical Records Act of 1978, D.C.Code § 32–501 *et seq.* (1981 ed., 1988 repl.).[5] In late 1992, however, the Council of the District of Columbia passed the Health Care Peer Review Act of 1992, D.C.Code §§ 32–501 *et seq.* (1981 ed., 1993 repl.), effective March 17, 1993. The committee report accompanying the act declared that the act was intended "to expand, strengthen and clarify the immunity and confidentiality provisions" of the existing peer review statute.[6] Appellants argued in the trial court that the 1992 act did not apply to pending litigation and should not be given retroactive effect, but have not made that argument on appeal. Applying the revised law, the trial court made successive rulings which had the effect of prohibiting disclosure of the Bacos report and the accompanying summary to the jury. It is this action that appellants now challenge on appeal.

## II.

### A.

The peer review privilege formerly in effect differed from the present one in two ways relating to this case. First, the privilege in the 1978 act was a qualified one that could be breached upon a showing of "extraordinary necessity." *See Jackson, supra* note 5, 596 A.2d at 525 n. 3. Under the 1992 act, the privilege is unqualified save in specified circumstances (such as use of the information in certain criminal proceedings) not relevant here. Thus, as appellants now concede, the trial court's earlier decision breaching the privilege on grounds of necessity no longer is in force. More pertinent to this appeal, the 1978 act provided that the "qualified privilege does not extend to primary health records *or to any oral or written statements submitted to* or presented before a ... peer review committee." D.C.Code § 32–505(a) (1981 ed., 1988 repl.) (emphasis added). By contrast, the new act declares that, except as otherwise provided by the section, "[t]he files, records, findings, opinions, recommendations, evaluations, and reports of a peer review body, *information provided to or obtained by a peer review body,* [and] the identity of persons providing information to a peer review body, ... shall be confidential and shall be neither discoverable nor admissible into evidence in any civil ... proceeding." D.C.Code § 32–505(a)(1) (1981 ed., 1993 repl.) (emphasis added).[7] The only exception to this rule, contained in § 32–505(b), is that *"primary health records* and other information, documents, or records available *from original sources* shall not be deemed nondiscoverable or inadmissible merely because they are a part of the files, records, or reports of a peer review body" (emphasis added).[8]

### B.

 As earlier pointed out, appellants concede that the summary statement attached to

---

4. Dr. Bacos could not recall "exactly who" that person was.

5. Those rulings resulted in interlocutory appeals by Dr. Scott and WHC, which were dismissed for lack of jurisdiction. *Scott v. Jackson,* 596 A.2d 523 (D.C.1991).

6. Report of the Committee on Consumer and Regulatory Affairs on Bill 9–355, The "Health Care Peer Review Act of 1992," at 3 (October 27, 1992) (hereafter "Report").

7. D.C.Code § 32–505(a)(2) reinforces the confidentiality by providing (*inter alia*) that "[n]o

person who ... provided information to a peer review body shall be compelled to testify or give discovery in any civil ... proceeding relating to any ... information provided to or obtained by any reports ... of the body or its members."

8. Section 32–501(7) defines a "[p]rimary health record" as "the record of continuing care maintained by a health professional, group practice, or health-care facility or agency containing all diagnostic and therapeutic services rendered to an individual patient by that health professional, facility, or agency."

the Bacos report was "information provided to" the WHC peer review committee. They contend, nonetheless, that it amounted to "information ... available from original sources," namely a person or persons who observed the operation and reported the observations to the committee, and thus it is discoverable under § 32–505(b). But this understanding of the exception, if followed, would swallow up the rule. Testimony or statements to the peer review body (and the identity of the persons making the statements) cannot be both confidential, § 32–505(a)(1), and at the same time discoverable based solely on the fact that the information derived from personal ("original") observation. Indeed, the persons a medical peer review body presumably would be most interested in interviewing are eyewitnesses to the surgery; yet if their information were discoverable from the peer review just because they are "original sources," the confidentiality with which the statute cloaks them and their statements would be mainly illusory. The meaning of "information ... available from original sources" is best gleaned from its statutory company, namely "primary health records and other ... documents[ ] or records available from original sources." The phrase thus naturally refers to facts and opinions contained in materials existing outside of the peer review process and discoverable as such. Created for purposes other than a peer review investigation, these materials are not "nondiscoverable or inadmissible merely because they are a part of the files, records, or reports of a peer review body." The key is that they not owe their *existence* to the peer review investigation.

This understanding makes sense of the revised statute viewed as a whole, and of the Council's deletion of the former exception to the privilege for "oral or written statements submitted to ... [a] peer review committee." In short, it best gives effect to the plain meaning of the statute. *See Peoples Drug Stores v. District of Columbia,* 470 A.2d 751, 753–54 (D.C.1983) (en banc). It also accords best with the Council's intent to "strengthen

... the confidentiality of peer review proceedings" and thereby enhance "the willingness of both health care providers and consumers to participate in the work of peer review entities." REPORT, *supra* note 6, at 2. Appellants' related argument that the Bacos committee's "factual findings" (as distinct from its conclusions and recommendations) are discoverable is likewise refuted by the plain meaning of the statute. *See* D.C.Code § 32–505(a)(1) ("The ... findings ... of a peer review body ... shall be confidential").

■ With inventiveness born of necessity, appellants argue in the alternative that the summary accompanying the Bacos report is a "primary health record" because the facts it contains *should* have been reflected in the hospital chart but were not. By definition, however, information not included in the chart is not part of a "record of continuing care," § 32–501(7), and thus falls outside of the exception for a primary health record. Moreover, requiring courts to determine *post hoc* whether information was or was not of the type customarily included in contemporaneous medical records would greatly obscure application of a statute intended to "strengthen and clarify the [former] ... confidentiality provisions." REPORT, *supra* note 6, at 3.

### C.

■ Appellants next challenge the trial court's refusal to let them use the Bacos report to impeach the testimony of the defendants' primary expert on the issue of negligence, Dr. Simmons. There was no dispute that Dr. Simmons had been shown the report's summary concerning Mrs. Jackson's surgery. Thus, according to appellants, "[t]he uncontradicted proffer of plaintiffs' counsel that Dr. Simmons had ignored contrary evidence [bearing on negligence] established a sufficient foundation" to permit impeachment with the otherwise confidential material. But the statute on its face is unqualified, providing no exception for use of peer review information to impeach.[9] More-

9. The Council was not unfamiliar with statutory exceptions to confidentiality provisions for impeachment use. *E.g.,* D.C.Code § 23–1303(d)

(1981 ed., 1989 repl.) (information contained in files of Pretrial Services Agency "shall not be admissible on the issue of guilt in any judicial

over, that exception too would contradict the Council's intent in the 1992 act to expand and strengthen the existing confidentiality: persons testifying to a committee, and the peer review process itself, would receive little protection if statements furnished could be disclosed as soon as the defendant's expert were cross-examined. We cannot find in the statute the broad exception appellants urge.

Hypothetically, of course, a question of basic fairness might arise if a defendant's medical expert were affirmatively to use portions of a peer review report in reaching his or her conclusion, yet could not be confronted with those or other parts on cross-examination. But no such hypothetical unfairness is alleged here. Appellants do not assert that Dr. Simmons relied on the Bacos report in any manner;[10] their argument, to the contrary, is that he failed to consider information that it contained about blood loss. Thus, no argument can be made that the court was obliged to override the statute and permit a use it does not sanction.[11]

### D.

 Finally, appellants contend that, at the least, WHC should not have been allowed to argue to the jury that the evidence demonstrated that Dr. Scott was not negligent, when it possessed the contrary indications stated in the Bacos report. This point merely reformulates the arguments already rejected. For purposes other than peer review itself (subject only to the exceptions enumerated), the statute treats peer review information as though it did not exist. It follows that a party is not precluded from arguing its own nonnegligence, based on evidence at trial, because of contrary information it may have received in conducting peer review. Otherwise the effect of generating such information would be no different in kind than if the information were admissible in evidence;

indeed, it would be harsher because the party acquiring the information would essentially be estopped from arguing its case. By gathering information and (through Dr. Bacos) making peer review findings, WHC did not "admit" to Dr. Scott's negligence for purposes of any future litigation; its counsel therefore did not—as appellants assert—violate Rule 3.3(a)(1) of the D.C.Rules of Professional Conduct ("A lawyer shall not knowingly: (1) Make a false statement of material fact ... to a tribunal") by arguing as truth the evidence of nonnegligence adduced in WHC's defense. The peer review privilege makes no judgment about the truth or falsity of the information, or the soundness of findings, contained in peer review reports; it simply shields them from disclosure in judicial and other proceedings. It thus leaves the parties free to argue the case on the evidence admitted, which is all the defendants did here.

### E.

 We close by reiterating what the statutory privilege does not do. It does not bar testimony by any witness about events forming the basis of a negligence action. And it does not bar discovery and admission into evidence of any written or other materials generated outside of the peer review procedure. It does preclude discovery and admission of information created by the peer review investigation itself, but that is a price the Council determined necessary to maximize recourse to and participation in this form of self-policing by the health care profession.

*Affirmed.*

---

proceeding, but such information may be used ... for the purposes of impeachment in any subsequent proceeding").

**10.** Appellants' own expert, Dr. Matar, also did not rely on the Bacos report; appellants merely assert that, "[a]lthough Dr. Matar did not refer *directly* to the peer review materials, his theory of the case rested on information which was clearly confirmed by those documents."

**11.** Appellants were not bereft of evidence to use in cross-examining Dr. Simmons about Mrs. Jackson's blood loss. There was evidence, discussed at length by the experts, that 5,000 cc's of blood had been replaced during the operation. And the "Pump Oxygenator Report" contained an entry that Dr. Scott was attempting to repair a "hole in [the] aorta."