# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 3, 2009 Session

# KIMBERLY POWELL v. COMMUNITY HEALTH SYSTEMS, INC. ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Chancery Court for Bradley County**
**No. 05285      Jerri S. Bryant, Chancellor**

---

**No. E2008-00535-SC-R11-CV - Filed May 24, 2010**

---

This appeal involves the evidentiary privilege in the Tennessee Peer Review Law of 1967 [Tenn. Code Ann. § 63-6-219 (Supp. 2009)]. A former hospital employee filed suit in the Chancery Court for Bradley County against the hospital and an orthopaedic surgeon on the hospital's medical staff. During discovery, the former employee sought to depose the hospital's infection control director regarding the details of an investigation into post-operative nosocomial infections and her knowledge of whether the defendant surgeon had tested positive for infectious diseases. The hospital moved for a protective order on the ground that the requested information was privileged under Tenn. Code Ann. § 63-6-219(e). The trial court declined to issue a protective order after determining that the information sought by the former employee was not privileged because it had been created in the regular course of the hospital's business and because the infection control director was the "original source" of the information. After granting the hospital an interlocutory appeal, a divided panel of the Court of Appeals affirmed the trial court. *Powell v. Cmty. Health Sys., Inc.*, No. E2008-00535-COA-R9-CV, 2009 WL 17850 (Tenn. Ct. App. Jan. 2, 2009). We granted the hospital's Tenn. R. App. P. 11 application for permission to appeal. We have determined that records received or made in the ordinary course of a hospital's business apart from the operation of a peer review committee are not protected by the peer review privilege in Tenn. Code Ann. § 63-6-219. We have also determined that documents prepared by or at the request of a peer review committee exercising its peer review function and documents prepared by third parties as part of the work of a peer review committee performing its peer review function are privileged. Finally, we have determined that the hospital did not waive its right to invoke the privilege in Tenn. Code Ann. § 63-6-219(e) with regard to the work performed by its infection control director in the context of a peer review proceeding.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, J., joined. GARY R. WADE, J., filed a separate opinion concurring in part and concurring in the judgment, in which JANICE M. HOLDER, C.J., joined. SHARON G. LEE, J., not participating.

C.J. Gideon, Jr., Brian P. Manookian, and Heather Piper-Coke, Nashville, Tennessee, for the appellant, National Healthcare of Cleveland, Inc. d/b/a Cleveland Community Hospital.

Grace E. Daniell and James M. Johnson, Chattanooga, Tennessee, for the appellee, Kimberly Powell.

G. Brian Jackson and David L. Johnson, Nashville, Tennessee, for the Amicus Curiae, Tennessee Hospital Association.

## OPINION

### I.[1]

Kimberly Powell began working as an operating room secretary at the Cleveland Community Hospital[2] on April 19, 2004. Her duties included preparing the surgery schedule, billing patients for operating room services, filling out reports, and managing the payroll of certain other operating room employees.

One of the physicians with whom Ms. Powell worked was Dr. Rickey Hutcheson, an orthopaedic surgeon affiliated with TriState Orthopedics, Rehabilitation and Pain Management Center, P.C. ("TriState Orthopedics"). Ms. Powell scheduled Dr. Hutcheson's surgeries, answered his telephone calls, retrieved his surgical instruments, and picked up his lunch. She also compiled a monthly report of the surgeries performed by Dr. Hutcheson and other surgeons employed by TriState Orthopedics.

Ms. Powell asserts that Dr. Hutcheson began to make sexually suggestive comments to her soon after she began working at the hospital. She also asserts that Dr. Hutcheson touched her back, knee, and thigh and that Dr. Hutcheson grabbed her and attempted to kiss

---

[1] The following recitation of facts is taken from the parties' allegations and assertions found in the record on appeal. These facts are not determinative of the factual issues with regard to which the parties have not had a full hearing. Our inclusion of any particular fact in this opinion should not be construed as a conclusive finding of fact that prevents the parties from presenting additional evidence regarding the fact or prevents the trial court or the jury from making contrary findings.

[2] The corporation that owns and operates the Cleveland Community Hospital is National Healthcare of Cleveland, Inc.

her on more than one occasion. In addition, Ms. Powell asserts that she complained about Dr. Hutcheson's conduct on at least three occasions to her immediate supervisor.

Ms. Powell was married in June 2004 and became pregnant soon thereafter. At some point,[3] an incident occurred in a supply room near the recovery room on the surgical floor. Ms. Powell and Dr. Hutcheson give markedly different accounts of this incident. Ms. Powell asserts that Dr. Hutcheson called her into the supply room and that, once she was in the room, he closed the door, turned off the lights, grabbed her breast, masturbated, and ejaculated onto her arm and into her hair. Dr. Hutcheson asserts that he ejaculated on Ms. Powell in the course of consensual oral sex in the supply room.

Ms. Powell resigned from the hospital in June 2005. On November 16, 2005, she filed suit in the Chancery Court for Bradley County against the hospital, its corporate owner,[4] Dr. Hutcheson, and TriState Orthopedics. She sought to recover damages for violation of the Tennessee Human Rights Act [Tenn. Code Ann. § 4-21-101 to -1001 (2005 & Supp. 2009)] and various torts, including assault and battery, constructive discharge, intentional or negligent infliction of emotional distress, interference with employment, and negligent hiring, supervision, and retention.

Ms. Powell claimed that she was particularly distraught about the supply room incident because she had been told by two hospital employees that Dr. Hutcheson had Hepatitis C and because she feared that either she or her unborn child could have contracted the illness from Dr. Hutcheson's bodily fluids. Even though tests performed by her obstetrician in September 2005 were negative for both Hepatitis B and Hepatitis C, Ms. Powell pursued aggressive discovery of the hospital's employees and medical staff regarding their knowledge of whether Dr. Hutcheson had Hepatitis.

In December 2006, Ms. Powell deposed Ms. Byler who served as the hospital's chief quality officer from February 2004 to May 2006. Ms. Byler testified that Sherri Sexton, the

---

[3]The timing of this incident is unclear from the record. Ms. Powell's handwritten notes, introduced as exhibits to her deposition, refer to a "physical attack" occurring between September and October of 2004; however, Ms. Powell testified at her deposition that she may have been referring to any number of unwanted touchings when she wrote "physical attack." A document attached to the deposition of Robin Byler, the hospital's Chief Quality Officer, which is dated June 30, 2005, and which records a meeting between Ms. Powell and the hospital's human resources department, states that the incident occurred approximately six months prior to the meeting. Ms. Powell's obstetrician testified at deposition that she informed him of an attack sometime in January 2005.

[4]In its Answer, Community Health Systems, Inc. denied that it was Ms. Powell's employer. Cleveland Community Hospital asserts that Community Health Systems, Inc. was dismissed by summary judgment on October 10, 2008; however, this disposition is not part of the record on appeal. The opinion of the Court of Appeals lists Community Health Systems, Inc. as a party on appeal.

hospital's infection control director, reported to her. She also stated that the hospital became concerned about the increased rate of post-operative infections occurring during the period from July to October 2004.[5] She testified that the hospital discussed the increased infection rate with the staff and also started an investigation into the source of the infections. The investigation included culturing "anything we could possibly think of," including sutures, equipment, the surgical team, patients, people in the recovery room, and three physicians, including Dr. Hutcheson. According to Ms. Byler, all of the tests of the physicians, including Dr. Hutcheson, were negative. Ms. Byler also testified that she was not aware that Dr. Hutcheson had any infectious diseases and that no one had ever voiced concerns to her about Dr. Hutcheson in that regard. Finally, Ms. Byler testified that the hospital's infection rate was lower than the national benchmark and that the increased infection rate in late 2004 was due to "the increase in patients and the patients' comorbidity."

In June 2007, Ms. Powell gave notice of her intention to depose Ms. Sexton. The hospital objected to this deposition and, in July 2007, moved for a protective order on the ground that the information sought from Ms. Sexton was protected by the privilege in Tenn. Code Ann. § 63-6-219(e). Ms. Powell opposed the hospital's motion on the ground that the records possessed by Ms. Sexton were not privileged because Ms. Sexton was the "original source" of the records and because Ms. Sexton prepared these records "as part of her regular job duties."[6] The trial court permitted Ms. Powell to depose Ms. Sexton for the limited purpose of determining whether the privilege in Tenn. Code Ann. § 63-6-219(e) applied to her testimony.

Ms. Sexton testified that her duties as infection control director were closely linked to the work of the hospital's Quality Review Committee.[7] She stated that when the hospital staff notified her that an infection had occurred, she would routinely conduct a limited investigation to determine whether the infection was hospital-related. This investigation included (1) examining the patient's chart, (2) possibly interviewing the patient, (3) reading the physician's notes, and (4) interviewing the staff. She also testified that her duties

---

[5]Ms. Byler testified that none of these infections occurred in Dr. Hutcheson's patients.

[6]Ms. Powell also challenged the hospital's invocation on other grounds which she has not asserted in this Court. Accordingly, we will not address them.

[7]Ms. Sexton stated that the Quality Review Committee was "designed specifically to allow for identification of areas that could become problematic and to allow internal review and peer evaluation, to correct problems." The members of the committee included the risk manager, pharmacy director, medical director, physician medical director, medical floor director, and a physician advisor. Ms. Byler submitted an affidavit which stated that she and Ms. Sexton investigated the increased rate of infections at the hospital, and that the purpose of the investigation was "to evaluate and improve the quality of healthcare rendered by providers at the hospital."

included educating the staff regarding the proper precautions and care for infections and to see to it that these precautions were being observed.

Ms. Sexton also testified that in addition to these limited investigations, she conducted specific tailored or targeted investigations at the request of or with the approval of the Quality Review Committee. The purpose of these investigations was to identify the source of an infection. Ms. Sexton stated that she conducted five to six of these investigations during her tenure and that the Quality Review Committee never refused her request to conduct one of these investigations. These more in-depth investigations included (1) reviewing charts, (2) interviewing patients and staff, (3) culturing equipment and staff members, and (4) tracking patients. The reports of these investigations were provided to the chairperson of the Quality Review Committee who distributed them to the members of the Committee either separately or included them with other reports submitted to the Committee.

Based on Ms. Sexton's deposition, Ms. Powell renewed her request to depose Ms. Sexton more broadly regarding her knowledge of any increased rate of post-operative nosocomial infections at the hospital and the hospital's awareness of any infectious diseases that Dr. Hutcheson may have had. Ms. Powell also requested the hospital and Ms. Sexton to produce the reports, tests, and other documentation that Ms. Sexton had compiled related to the increased rate in post-operative infections, as well as the log books for the operating and recovery rooms.

On February 14, 2008, the trial court filed an order allowing the deposition of Ms. Sexton because "the information sought by the Plaintiff is not documentation generated during the peer review process." The trial court found that the requested information was (1) created as part of the hospital's regular course of business and (2) otherwise available from original sources. The trial court also granted Ms. Powell's motion to compel production of the log books. The hospital[8] sought permission to pursue a Tenn. R. App. P. 9 interlocutory appeal from this order, and the trial court filed an order on March 5, 2008, granting permission to the hospital.[9] The Court of Appeals likewise granted the hospital's application for an interlocutory appeal.

---

[8]Community Health Systems, Inc. joined in this motion.

[9]It is unclear from the record whether the trial court's decision to allow Ms. Sexton's deposition also granted Ms. Powell access to the documents she was seeking. While the court's order makes reference to "documentation" and to "the information sought by the Plaintiff in her Motion to Take the Second Deposition of Sherri Sexton," the court noted that the grant of the interlocutory appeal was on the "narrow issue" of "allowing discovery *of Sherri Sexton* into her investigation of an increased infection rate." (Emphasis added.) Ms. Sexton testified in her deposition that she personally did not have any records, and that any records in existence would be "maintained by the facility."

A divided panel of the Court of Appeals affirmed the trial court. The majority addressed the propriety of deposing Ms. Sexton about the information she obtained during an investigation "apparently at the direction of the review committee." Based on Ms. Sexton's testimony that such investigations were "part of her normal job duties," the majority determined that documents in Ms. Sexton's possession would be discoverable because they were "records she made in conjunction with the regular course of business of the hospital" and because Ms. Sexton was the "original source" of the documents that she created. The majority also concluded that "[t]he fact that such records or the information was provided to the peer review committee would not prevent its discovery." *Powell v. Cmty. Health Sys., Inc.*, 2009 WL 17850, at *5. In his dissent, Judge Susano concluded that the investigation did not occur in the regular course of the hospital's business and that Ms. Sexton was not the original source of the information because she merely compiled the information collected from original sources. *Powell v. Cmty. Health Sys., Inc.*, 2009 WL 17850, at *6.

We granted the hospital's Tenn. R. App. P. 11 application to determine whether deposing Ms. Sexton regarding her knowledge of an increase in post-operative nosocomial infections and the hospital's awareness of any infectious diseases Dr. Hutcheson may have contracted is permissible under the Tennessee Peer Review Law of 1967. The hospital asserts that all of Ms. Sexton's information was obtained at the direction of its Quality Review Committee and not in the regular course of its business and that Ms. Sexton is not an original source of any of the information. Ms. Powell maintains (1) that the Quality Review Committee is not a peer review committee for the purposes of the Tennessee Peer Review Law of 1967, (2) that the investigations of post-operative nosocomial infections are not protected by the peer review privilege because they were conducted in the regular course of the hospital's business, (3) that Ms. Sexton's testimony is not protected by the peer review privilege because she is the original source of the information, and (4) that the hospital waived its right to assert the peer review privilege with regard to Ms. Sexton's testimony by permitting another hospital employee to testify about related matters without objection.

## II.

The standard of review in discovery disputes involving the application of the privilege in Tenn. Code Ann. § 63-6-219(e) is discussed in detail in our opinion in *Lee Medical, Inc. v. Beecher*, ___ S.W.3d ___ (Tenn. 2010) (filed contemporaneously with this opinion). Like any other discovery dispute, a trial court's decision with regard to the application of Tenn. Code Ann. § 63-6-219(e) is reviewed using the "abuse of discretion" standard of review. *Lee Medical, Inc. v. Beecher*, ___ S.W.3d at ___. Thus, a reviewing court must review the factual findings underlying the trial court's decision using the preponderance of the evidence standard in Tenn. R. App. P. 13(d) but must review the trial court's legal determinations de novo without any presumption of correctness. *Lee Medical, Inc. v. Beecher*, ___ S.W.3d at ___.

When a discovery dispute involves the application of a privilege, the court's judgment should be guided by the following three principles. First, Tennessee's discovery rules favor discovery of all relevant, non-privileged information. Second, even though privileges do not facilitate the fact-finding process, they are designed to protect interests and relationships that are regarded as sufficiently important to justify limitations on discovery. Third, while statutory privileges should be fairly construed according to their plain meaning, they need not be broadly construed. *Lee Medical, Inc. v. Beecher*, ___ S.W.3d at ___.

### III.

Despite the relative longevity of the privilege in Tenn. Code Ann. § 63-6-219(e), Tennessee's appellate courts have had few occasions to construe and apply it. Accordingly, the courts have not employed a uniform approach for determining when and under what circumstances the privilege in Tenn. Code Ann. § 63-6-219(e) may be invoked. We have undertaken to suggest this approach in *Lee Medical, Inc. v. Beecher*.

The threshold issue in any case involving the application of an evidentiary privilege is whether the privilege being asserted applies to the materials sought to be discovered. *Lee Medical, Inc. v. Beecher*, ___ S.W.3d at ___. Analyzing this issue requires a two-step analysis. With specific regard to the privilege in Tenn. Code Ann. § 63-6-219(e), the first step is to determine whether the subject matter of the underlying proceeding is within the subject matter covered by the statute. The second step is to determine whether the person or entity from whom the information is sought is a person or entity protected by the statute. If the answer to either question is "no," the information being sought is not privileged, and the court should deny the invocation of the privilege and permit the discovery of the information being sought. If, however, the court determines that the subject matter of the proceeding and the person or entity from whom the information is being sought are included within the reach of Tenn. Code Ann. § 63-6-219, the court should then proceed to address the other specific disputes regarding the invocation of the privilege that may have been raised.

This appeal presents four issues regarding the application of the privilege in Tenn. Code Ann. § 63-6-219(e). The first issue is whether the hospital's Quality Review Committee is a peer review committee as defined in Tenn. Code Ann. § 63-6-219(c). The second issue is whether the records of the Quality Review Committee are records made in the regular course of the hospital's business and are, therefore, not covered by the privilege. The third issue is whether the hospital's infection control director who performs investigations at the request of the Quality Review Committee is an "original source" whose documents and records are not immune from discovery. The fourth issue is whether the hospital waived its right to assert the privilege by permitting its chief quality officer to testify regarding targeted investigations into the possible connection between the defendant surgeon and the nosocomial infections.

Consistent with the approach we employed in *Lee Medical, Inc. v. Beecher*, the first question we must address is whether the subject matter of the underlying proceeding is covered by Tenn. Code Ann. § 63-6-219. While the parties have not directly addressed this question, the record contains sufficient evidence to provide a sound answer.

**A.**

The lynchpin of the hospital's privilege claim is its Quality Review Committee. Despite the committee's central importance to this discovery dispute, the record on appeal contains surprisingly little authoritative information regarding (a) the committee's composition, (b) its purpose and responsibilities, (c) its relationship to other hospital committees or the hospital administration, or (d) the manner in which the committee carries out its tasks. Virtually all of the information in the record regarding the committee was provided by Ms. Sexton. Ms. Sexton was not a member of the committee, but she provided staff support to the committee in her capacity as the hospital's infection control director.

Ms. Sexton was able to provide only general information regarding the composition of the hospital's Quality Review Committee.[10] Both Ms. Sexton and Ms. Byler testified that one of the committee's duties was to track the infection rate at the hospital and to direct and oversee the hospital's efforts to minimize the incidence of infections. Ms. Sexton explained that the "[q]uality review committee as I understand it, is a committee that is designed specifically to allow for identification of areas that could become problematic and to allow internal review and peer evaluation to correct problems or correct areas that could become problematic." She also stated that the committee was "a protected forum so that the hospital can look at and fix things that could become a problem later on down the road."

According to Ms. Sexton, she assisted the committee in monitoring and addressing the infection rate at the hospital in two ways. First, Ms. Sexton was responsible for collecting information regarding infections and providing a monthly report to the committee. Ms. Sexton testified that she obtained this routine information from many sources, including: (a) the hospital's daily census, (b) the daily report of surgeries to be performed, (c) reports from staff members, and (d) reports of patients admitted to the hospital with infections or

---

[10]When asked to identify the members of the committee, Ms. Sexton stated that the committee was composed of the "[r]isk manager, pharmacy director, medical director, physician medical director, medical floor director, director of medical floors. I don't know if the surgical director was on the committee or not. The ER director was not. It's basically a set number of directors in the facility and a physician advisor who has final say."

other conditions of concern.[11]  Ms. Sexton also testified that she examined the patients and their charts when infections and conditions of concern were reported.

In addition to making sure that the hospital staff was taking the proper precautions to deal with these conditions, Ms. Sexton prepared a monthly report summarizing the incidence of infections in the hospital during the preceding month.  In this report, she categorized the reported infections either as community-acquired or hospital-acquired.  She further categorized the hospital-acquired infections as catheter-related, blood-related, or post-operative.  This report did not identify the physicians treating the patients with these infections.

Ms. Sexton provided her monthly report only to the chairperson of the Quality Review Committee.  The chairperson of the committee included Ms. Sexton's report in a master report that was reviewed by the committee at its monthly meetings.  According to Ms. Sexton, all copies of the master report were turned in following the committee's meeting, and only one copy of the report was retained by the committee.  Once the committee reviewed and accepted her report, Ms. Sexton routinely destroyed the work papers she had used to prepare her report.

Ms. Sexton performed a second function for the Quality Review Committee apart from her normal daily duties as infection control director.  Whenever the data she routinely collected suggested an increased incidence of infection in any part of the hospital, Ms. Sexton reported her concern to the committee and requested the committee's permission to conduct a focused or targeted investigation to determine the cause or the source of the infection. Ms. Sexton explained that advance committee authorization was required for three reasons.  First, these focused investigations invaded the privacy of the patients and the staff.  Second, they had a potential for causing alarm and concern.  Finally, they disrupted the regular work at the hospital and placed significant additional demands on the staff.

Ms. Sexton testified that these focused investigations were not part of her regular duties and that she undertook only five or six of these investigations during her tenure as the hospital's infection control director.[12]  She also testified that the reports of the results of these investigations were provided only to the Quality Review Committee.

---

[11]As examples of infection or conditions of concern, Ms. Sexton mentioned MRSA infections, tuberculosis, and meningitis.

[12]Ms. Sexton stated that "[a] focused review is not something that you do on a routine daily interaction.  That is something that is specific.  It is outside your normal activities.  It is designed to identify and correct."

**B.**

Both Ms. Byler and Ms. Sexton testified that the Quality Review Committee, apart from its general oversight of the operation of the hospital, had the power to initiate specific, targeted investigations. Ms. Byler testified that the committee initiated just such an investigation into the increased nosocomial infection rate in the hospital in late 2004. She confirmed that this investigation focused on the personnel in the operating and recovery rooms and all the surgeons, including Dr. Hutcheson and two other orthopaedic surgeons. The investigation included taking "nasal culture[s]" from Dr. Hutcheson and the two other orthopaedic surgeons.

We held in *Lee Medical, Inc. v. Beecher*, that the privilege in Tenn. Code Ann. § 63-6-219(e) applies only to peer review proceedings regarding a physician's professional conduct, competence, and ability to practice medicine. *Lee Medical, Inc. v. Beecher*, ___ S.W.3d at ___. The evidence in this record shows that some, but not all, of the functions of the Quality Review Committee were peer review proceedings involving the professional conduct, competence, and ability to practice medicine of the physicians on the hospital's medical staff. While the committee's general oversight responsibilities may not quality as peer review proceedings for the purpose of Tenn. Code Ann. § 63-6-219, the committee's investigation of the role, if any, that the medical staff might have played in the increased rate of post-operative nosocomial infections in late 2004 was just such a proceeding. Insofar as this investigation addressed the conduct of physicians, the materials prepared and the information gained by Ms. Sexton qualify for protection under Tenn. Code Ann. § 63-6-219(e).

**V.**

Having determined that the focused investigation into the increase in the nosocomial infection rate in late 2004 is a peer review proceeding for the purpose of Tenn. Code Ann. § 63-6-219, the next question is whether the hospital's Quality Review Committee is a "peer-review committee" as defined in Tenn. Code Ann. § 63-6-219(c).[13] This statutory definition includes "a committee of any licensed health care institution . . . the function of which, or one (1) of the functions of which, is to evaluate and improve the quality of health care rendered by providers of health care service." Ms. Sexton's testimony, which is essentially undisputed, coupled with Ms. Byler's affidavit and deposition testimony, establishes that one of the Committee's functions is to evaluate and improve the quality of the health care provided at the hospital. Thus, based on the broad definition in Tenn. Code Ann. § 63-6-

---

[13]We have noted that, for the purpose of Tenn. Code Ann. § 63-6-219, the terms "peer review committee" and "medical review committee" as defined in Tenn. Code Ann. § 63-6-219(c) are interchangeable. *Lee Medical, Inc. v. Beecher*, ___ S.W.3d at ___.

219(c), the hospital's Quality Review Committee is a "peer review committee" for the purpose of the statute when it is performing a focused or targeted investigation.

Rather than addressing the plain language of this statutory definition head on, Ms. Powell asserts, with scant legal support, that committees performing infection control functions should not be considered to be peer review committees. We decline to adopt such a broad rule. A majority of jurisdictions that have addressed this issue have held that an infection control committee is a peer review committee when it is engaging in activities aimed at improving the quality of health care. *E.g.*, *Davidson v. Light*, 79 F.R.D. 137, 139-41 (D. Colo. 1978); *Arnett v. Dal Cielo*, 923 P.2d 1, 10 (Cal. 1996); *Santa Rosa Mem'l Hosp. v. Superior Court*, 220 Cal. Rptr. 236, 242-43 (Ct. App. 1985); *Babcock v. Bridgeport Hosp.*, 742 A.2d 322, 347 (Conn. 1999); *Cobb County Kennestone Hosp. Auth. v. Martin*, 430 S.E.2d 604, 605-06 (Ga. Ct. App. 1993); *Ekstrom v. Temple*, 553 N.E.2d 424, 427-28 (Ill. App. Ct. 1990); *Smith v. Lincoln Gen. Hosp.*, 605 So. 2d 1347, 1348 (La. 1992); *In re "K,"* 561 A.2d 1063, 1068-69 (N.H. 1989); *In re Univ. of Texas Health Ctr.*, 33 S.W.3d 822, 825 (Tex. 2000).

Ms. Powell's arguments against treating the hospital's Quality Review Committee as a peer review committee rest chiefly on her assertion that the purpose of the peer review process is to identify and expose physicians who engage in misconduct rather than to conceal them. She argues that to permit the hospital to invoke the privilege in Tenn. Code Ann. § 63-6-219(e) is contrary to this policy and that the hospital should not be permitted to use "a law enacted to shed light on physician misconduct to shield the misconduct of a staff physician contributing substantially to its operating room's bottom line." She insists that "[a] fair reading of the Tennessee Peer Review Law's purpose and intent demonstrates that the Law should not serve the Hospital's or Hutcheson's interests in this aberrant way."

These broadside arguments against the privilege in Tenn. Code Ann. § 63-6-219(e) are not without some force. However, the peer review privilege in Tenn. Code Ann. § 63-6-219(e) reflects a legislative judgment that the public interest in promoting candor among health care providers requires an assurance of confidentiality and that "the quality of in-hospital medical practice will be elevated by armoring staff inquiries with a measure of confidentiality." *See West Covina Hosp. v. Superior Court*, 718 P.2d 119, 123 (Cal. 1986). The responsibility of the courts is to apply Tenn. Code Ann. § 63-6-219(e) according to its plain meaning. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 808 (Tenn. 2007). Thus, the privilege in Tenn. Code Ann. § 63-6-219(e) applies to infection control committees when they are engaging in a peer review function.

Based on the evidence in this record, it does not appear that the Quality Review Committee was investigating a particular infection incident during the time period of interest to Ms. Powell. To the contrary, both Ms. Sexton and Ms. Byler stated that the hospital was

conducting a focused investigation, authorized by the Quality Review Committee, into the increased rate of post-operative nosocomial infections in late 2004. The purpose of this investigation was to evaluate and improve the quality of the health care at the hospital. Based on this evidence, the only conclusion that can be drawn is that the committee is a peer-review committee as defined in Tenn. Code Ann. § 63-6-219(c).

## VI.

Ms. Powell asserts that even if the hospital's Quality Review Committee was functioning as a peer review committee when it conducted the focused investigation into the increased rate of post-operative infections in late 2004, the information obtained during the investigation is not privileged because it was obtained in the regular course of the hospital's business. Her tautological argument is that because the hospital is legally required to have a functioning Quality Review Committee, all records of the committee must necessarily be made in the regular course of the hospital's business.

This argument is based on the provision in Tenn. Code Ann. § 63-6-219(e) exempting from the coverage of the statutory privilege "records made in the regular course of business by a hospital or other provider of health care" that have been presented to a peer review committee "during the proceedings of such committee." While the courts are not required to interpret statutory privileges expansively, we are required to interpret all statutes in a way that makes sense rather than nonsense. *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1072, § 113, *as recognized by Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 313 (Tenn. 2005) (holding that the Court is restrained from adopting an interpretation of any statute that would lead to absurd results); *N.C. & St. L. Ry. v. Carroll County*, 12 Tenn. App. 380, 386 (1930) (expressing a preference of interpreting legislative enactments in a way that makes "practical sense" rather than "void nonsense").

The purpose of creating a peer review privilege would be undermined entirely if information prepared or assembled during a peer review proceeding were characterized as "records made in the regular course of business by a hospital." Addressing this precise issue, the Court of Appeals has noted that exempting from the privilege "all documents prepared in the 'regular course of *peer review* business' . . . would completely swallow the rule." *Roy v. City of Harriman*, 279 S.W.3d 296, 304 (Tenn. Ct. App. 2008). We agree.

In applying similar privileges, courts in other jurisdictions have distinguished between records prepared in the regular course of a hospital's business independent of a peer review proceeding and records prepared as part of a peer review proceeding. These courts have held that records received or created in the regular course of the hospital's business prior to the

commencement of or independent of a peer review proceeding are not privileged. Thus, regularly prepared complaints and incident reports are not privileged even though they might precipitate a peer review proceeding.[14] At the same time, other courts have recognized that documents made or prepared exclusively for the peer review committee are privileged.[15]

We agree with the Court of Appeals' decision in *Roy v. City of Harriman* and with the decisions in other jurisdictions that the exception for records made in the regular course of the hospital's business applies only to records that exist independently of the peer review process. Any other interpretation would render the privilege in Tenn. Code Ann. § 63-6-219(e) a nullity because peer review committees generate records on a routine basis in the regular course of their business. Documents created at the request of a peer review committee exercising its peer review functions or documents that owe their existence to the peer review process are not discoverable. On the other hand, information which was not created or recorded at the request of a peer review committee exercising its peer review functions but which exists as part of a hospital's routine business records is discoverable. In the case at bar, Ms. Sexton gathered and compiled data both as part of the hospital's regular course of business and at the behest of the Quality Review Committee. The information Ms. Sexton gathered as part of the hospital's routine analysis of infection data is discoverable if it still exists. Any information she gathered as part of the peer review process is privileged.

## VII.

Ms. Powell also insists that she should be permitted to depose Ms. Sexton regarding the focused investigation of the increased rate of post-operative infections in late 2004 because Ms. Sexton is the "original source" of this information. Her argument is based on the provision in Tenn. Code Ann. § 63-6-219(e) exempting from the peer review privilege "records otherwise available from original sources" that have been presented to a peer review committee "during the proceedings of such committee."

---

[14] *See, e.g., John C. Lincoln Hosp. & Health Ctr. v. Superior Court for Ariz.*, 768 P.2d 188, 191 (Ariz. Ct. App. 1989) (incident reports); *Chicago Trust Co. v. Cook County Hosp.*, 698 N.E.2d 641, 647-49 (Ill. App. Ct. 1998) (incident reports); *Leanhart v. Humana Inc.*, 933 S.W.2d 820, 820-21 (Ky. 1996) (complaints); *Huether v. Dist. Court of Sixteenth Judicial Dist. of Mont.*, 4 P.3d 1193, 1197 (Mont. 2000) (incident reports); *Nebraska ex rel. AMISUB, Inc. v. Buckley*, 618 N.W.2d 684, 695-99 (Neb. 2000) (incident reports); *Columbia/HCA Healthcare Corp. v. Eighth Judicial Dist. Court of Nev.*, 936 P.2d 844, 850 (Nev. 1997) (factual reports obtained before peer review proceedings were commenced); *but see Ussery v. Children's Healthcare of Atlanta, Inc.*, 656 S.E.2d 882, 894 (Ga. Ct. App. 2008) (finding that incident reports were privileged).

[15] *In re Osteopathic Med. Ctr. of Tex.*, 16 S.W.3d 881, 886 (Tex. App. 2000); *Riverside Hosp., Inc. v. Johnson*, 636 S.E.2d 416, 424-25 (Va. 2006).

We addressed the "original source" exception to the peer review privilege in 2007 in a case involving the efforts of a physician to obtain information that had been submitted to a hospital during its credentialing process. *Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 226 S.W.3d 280, 286 (Tenn. 2007). We held that all the information submitted to the hospital's credentialing committee was privileged and could not be obtained from the hospital. *Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 226 S.W.3d at 286-87. However, noting that the information being sought had been furnished to the credentialing committee by original sources "outside the committee," we held that information could be obtained directly from the original sources unless it was otherwise privileged. *Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 226 S.W.3d at 287.

We noted in *Stratienko* that the term "original source" referred to sources "outside the committee." We must now decide whether an agent of a peer review committee or an independent third party acting at the request of a peer review committee is likewise an "original source" for the purpose of applying the "original source" exception. We have determined that persons acting on behalf of or at the request or direction of a peer review committee performing its peer review functions are not "original sources" from whom the information prepared for the committee's use can be discovered. To hold otherwise would be to eviscerate the privilege.

The peer review privilege in Tenn. Code Ann. § 63-6-219(e) applies to information that was created at the behest of a peer review committee. It covers information gathered or prepared by the members of the committee and information gathered or prepared by others at the committee's request. *See Manthe v. VanBolden*, 133 F.R.D. 497, 501 (N.D. Tex. 1991) (focusing on content rather than labels); *Babcock v. Bridgeport Hosp.*, 742 A.2d at 343; *Jordan v. Court of Appeals for Fourth Supreme Judicial Dist.*, 701 S.W.2d 644, 648 (Tex. 1985). However, for the privilege to apply, the information must be used for peer review purposes. If it originated outside the peer review process, it is not privileged. *See Yuma Reg'l Med. Ctr. v. Superior Court for Ariz.*, 852 P.2d 1256, 1260 (Ariz. Ct. App. 1993); *Jackson v. Scott*, 667 A.2d 1365, 1368-69 (D.C. 1995); *Cobb County Kennestone Hosp. Auth. v. Martin*, 430 S.E.2d at 605; *Nebraska ex rel. AMISUB, Inc. v. Buckley*, 618 N.W.2d at 695; *Southwest Cmty. Health Servs. v. Smith*, 755 P.2d 40, 44 (N.M. 1988).

Ms. Sexton is not an original source for the purposes of Tenn. Code Ann. § 63-6-219(e) for two reasons. First, the focused investigation that she performed and the report of that investigation she prepared were undertaken at the request of the Quality Review Committee in the exercise of its peer review functions. Second, Ms. Sexton is not the original source of any information she collated and included in her routine monthly reports. Her testimony indicates that she prepared her monthly reports based on information provided by others. These other persons are the "original sources" of the information received by Ms. Sexton. Thus, as long as this information was prepared as a routine matter independent of

the peer review process and is not otherwise privileged, it is discoverable from original sources, not from Ms. Sexton.

## VIII.

As a final matter, Ms. Powell asserts that the hospital waived its right to rely on the privilege in Tenn. Code Ann. § 63-6-219(e) with regard to its knowledge of whether Dr. Hutcheson has tested positive for Hepatitis C or any other infectious disease. She insists that the hospital should not be permitted to invoke the privilege for Ms. Sexton's testimony because it permitted Ms. Byler to be deposed about the same matters. The hospital responds that it has consistently and vigorously asserted the privilege with regard to Ms. Sexton and that Ms. Powell herself should not be permitted to make her waiver argument in this Court because she did not make it in the courts below.

### A.

It is axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court. *Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006); *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 905-06 (Tenn. 2004); *see also* Tenn. R. App. P. 3, adv. comm'n cmt., subdiv. (e) (noting that "[f]ailure to present an issue to the trial court . . . will typically not merit appellate relief"). Parties invoking this principle have the burden of demonstrating that the issue sought to be precluded was, in fact, not raised in the trial court. *Fayne v. Vincent*, 301 S.W.3d 162, 171(Tenn. 2009).

Determining whether parties have waived their right to raise an issue on appeal should not exalt form over substance. Appellate courts must carefully review the record to determine whether a party is actually raising an issue for the first time on appeal. *Fayne v. Vincent*, 301 S.W.3d at 171 n.6. The fact that the party phrased the question or issue in the trial court in a different way than it does on appeal does not amount to a waiver of the issue. *Fahrner v. S.W. Mfg., Inc.*, 48 S.W.3d 141, 143 n.1 (Tenn. 2001) (noting that "the failure to use the right label does not result in a waiver").

Contrary to the hospital's assertion, the record of the trial court proceedings reflects that Ms. Powell opposed the hospital's claim of privilege with regard to Ms. Sexton's testimony on the ground that the hospital had permitted Ms. Byler to be deposed on the same subject. Both in her response to the hospital's motion for a protective order and in her motion to depose Ms. Sexton a second time, Ms. Powell argued that

> during the deposition of Ms. Byler, the hospital did not claim
> that any of the information pertaining to infection rates at the

hospital, the investigation of the infection rates, or Dr. Hutcheson's infection rate, was part of an investigation by a medical review committee or was privileged or immune from discovery.

While Ms. Powell may not have used the word "waive" or "waiver" in her papers, her argument put both the hospital and the trial court on notice that she opposed the hospital's claim of privilege on the ground that the hospital had permitted Ms. Byler to testify on the same subjects without asserting the privilege. Accordingly, we have concluded that the hospital has not demonstrated that Ms. Powell failed to raise her "waiver" of privilege argument in the trial court.[16]

## B.

We are dealing here with a statutory, as opposed to a common-law, privilege. We must not take the matter of waiver of this privilege lightly because weakening this privilege could undermine the confidentiality that the privilege is intended to protect. We have already pointed out that Tenn. Code Ann. § 63-6-219(e) reflects the General Assembly's considered judgment that the harm caused by disclosure of peer review information exceeds the benefit to be gained by permitting disclosure of the information.[17] It is not our prerogative to second-guess the manner in which the General Assembly has balanced these competing interests.

Our waiver analysis must begin with the statute itself. Unlike the peer review statutes in other states,[18] Tenn. Code Ann. § 63-6-219(e) does not contain a provision expressly permitting the waiver of the privilege. Nor does it contain any express exceptions to the

---

[16] The hospital also asserts that Ms. Powell should not be permitted to pursue her waiver of privilege argument because she did not renew the argument in the Court of Appeals. The hospital is correct that Ms. Powell did not include this argument in the brief she filed in the Court of Appeals. Rather, her brief focused on the two grounds that the trial court relied upon to reject the hospital's privilege claim. Having prevailed in the trial court on other grounds, Ms. Powell, as appellee, was responding to the issues raised by the hospital as the appellant. While Ms. Powell could conceivably have advanced her waiver argument as an alternative grounds to affirm the trial court's decision, she was not required to do so. In the procedural posture of this case, we decline to find that Ms. Powell waived her waiver argument by failing to raise it in the Court of Appeals.

[17] Tenn. Code Ann. § 63-6-219(b)(1) states that "Tennessee further recognizes that confidentiality is essential both to effective functioning of these peer review committees and to continued improvement in the care and treatment of patients."

[18] *See, e.g.*, Ind. Code Ann. § 34-30-15-10 (West 2009); Tex. Occ. Code Ann. § 160.007(e) (West 2009); W. Va. Code Ann. § 30-3C-3 (West 2010).

confidentiality rule. The only mention of waiver in the statute appears in the context of a provision stating that the disclosure of peer review information to other peer review organizations does not amount to a waiver of the privilege.[19]

In the absence of a statute to the contrary, only the person entitled to the benefit of a privilege may waive the privilege. *See Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984). However, the ability to waive a privilege, even a statutory one, is not without limit. Over seventy years ago, we endorsed the principle that "one may waive by agreement the benefit of a statutory provision, unless public policy or the rights of third parties would be violated." *Black Diamond Coal Mining Co. v. Rankin*, 170 Tenn. 651, 653, 98 S.W.2d 311, 312 (1936). Thus, in the absence of an express statutory waiver provision, we must ascertain (1) for whose benefit the peer review privilege exists and (2) whether permitting the waiver of this privilege is contrary to public policy or would violate the rights of third parties.

The peer review privilege is intended to benefit the entire peer review process, not simply the individuals participating in the process. *See, e.g., Marshall v. Planz*, 145 F. Supp. 2d 1258, 1273 (M.D. Ala. 2001); *Terre Haute Reg'l Hosp., Inc. v. Basden*, 524 N.E.2d 1306, 1311 (Ind. Ct. App. 1988); *State ex rel. St. John's Reg'l Med. Ctr. v. Dally*, 90 S.W.3d 209, 214-15 (Mo. Ct. App. 2002). The proper functioning of the peer review process hinges on the assurance to all persons participating in it – the members of the peer review committees, the persons under review, and the persons who provide information and opinions during the peer review process – that the information and opinions provided and discussed during the proceeding will remain confidential. Any breach in this confidentiality undermines the process. Therefore, we are hesitant to empower persons participating in the process to waive confidentiality unilaterally when the General Assembly itself has recognized no exceptions to the confidentiality requirement.[20]

---

[19]Tenn. Code Ann. § 63-6-219(e) states, in part:

One (1) proper function of such committees shall include advocacy for physicians before other medical peer review committees, peer review organizations, health care entities, private and governmental insurance carriers, national or local accreditation bodies, and the state board of medical examiners of this or any other state. The disclosure of confidential, privileged peer review committee information to such entities during advocacy, or as a report to the board of medical examiners under § 63-6-214(d), or to the affected physician under review, does not constitute either a waiver of confidentiality or privilege.

[20]For example, the Supreme Court of Virginia has held that Virginia's version of the privilege cannot be waived by a physician under review. *HCA Health Servs. of Va., Inc. v. Levin*, 530 S.E.2d 417, 420 (Va. 2000).

Under Tennessee law, waiver of a statutory privilege should not be permitted if the waiver undermines public policy or impairs the rights of third parties. Permitting participants in a peer review proceeding to waive the privilege – no matter how meritorious the justification – not only undermines the efficacy of the peer review process but also adversely affects those who provided information or opinions to the peer review committee in reliance on the statutory assurance of confidentiality. Other courts construing peer review statutes similar to Tennessee's that do not contain express waiver provisions have concluded that judicially-created waivers are inappropriate. *See, e.g.*, *Armstrong v. Dwyer*, 155 F.3d 211, 221 (3d Cir. 1998); *Emory Clinic v. Houston*, 369 S.E.2d 913, 914 (Ga. 1988); *Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 692 n.28 (Mass. 2005); *Ollman v. Wis. Health Care Liability Ins. Plan*, 505 N.W.2d 399, 406-07 (Wis. Ct. App. 1993).

We concur with these decisions. While we are not unmindful that declining to engraft a waiver provision onto Tenn. Code Ann. § 63-6-219(e) could enable some parties to engage in strategic behavior,[21] we have concluded that the proper course is to defer to the General Assembly, as the author of the peer review privilege, to determine if and under what circumstances the privilege may be waived.

## IX.

In summary, we have determined that the underlying proceeding in this case was a peer review proceeding for the purpose of Tenn. Code Ann. § 63-6-219 and that the hospital's Quality Review Committee is a peer review committee as defined in Tenn. Code Ann. § 63-6-219(c). We have also determined that the trial court erred by concluding (1) that Ms. Sexton was an "original source" of information submitted to the hospital's Quality Review Committee with regard to the focused investigation into the increased rate of post-operative nosocomial infections occurring in late 2004 and (2) that the information that Ms. Sexton gathered and submitted to the Quality Review Committee as part of its focused investigation was made in the regular course of the hospital's business.

Accordingly, we reverse the judgment of the Court of Appeals and find that the trial court erred by failing to grant the hospital's motion to prevent Ms. Powell from deposing Ms. Sexton or from requiring Ms. Sexton to produce the reports she prepared for the Quality Review Committee relating to the hospital's focused investigation of physicians regarding increased nosocomial infection rates in late 2004. Therefore, we reverse the trial court's February 14, 2008 order and remand the case to the trial court for further proceedings

---

[21] In other contexts, the courts have recognized that circumstances can arise when fairness requires that a partial waiver of a privilege be treated as a complete waiver of the privilege. These circumstances arise when a party makes assertions in litigation that otherwise put its privileged information at issue or when a party uses the privilege as a sword rather than as a shield. *See Arnold v. City of Chattanooga*, 19 S.W.3d 779, 787 (Tenn. Ct. App. 1999).

consistent with this opinion. The costs of this appeal are taxed to Kimberly Powell for which execution, if necessary, may issue. The portion of the costs associated with the filings of the Tennessee Hospital Association as amicus curiae are hereby taxed to the Tennessee Hospital Association.


_____
WILLIAM C. KOCH, JR., JUSTICE