IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 16, 2023 Session

## JTM ENTERPRISES v. ODDELLO INDUSTRIES, LLC

**Appeal from the Chancery Court for Hamblen County**
**No. 2019-CV-583    Douglas T. Jenkins, Chancellor**

_____

**No. E2022-00855-COA-R3-CV**

_____

The parties' dispute centers upon whether a tenant is required to pay rent for a particular ten-month period. The landlord asserts that it delayed but did not waive payment. The tenant counters that the landlord's agent waived rent and that the tenant forbore terminating the lease based on the agent's representations. The trial court, after setting aside a default judgment, concluded that the landlord's agent did not have the authority to waive rent but had the authority to modify the lease to reduce rent for three of the ten months. The tenant appeals, arguing that the trial court erred in its determination as to the agent's authority, the issue of estoppel, and the issue of waiver. The landlord asserts that the trial court erred in setting aside the default judgment and in reducing the rent for the three-month period. After a review of the record, we affirm the setting aside of the default judgment but reverse the trial court's ruling on the agent's authority and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
in Part; Reversed in Part; Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Ronald S. Range, Jr., and Catherine A. Karczmarczyk, Johnson City, Tennessee, for the appellant, Oddello Industries, LLC.

Lauren Armstrong Carroll, Morristown, Tennessee, for the appellee, JTM Enterprises.

**OPINION**

I.

In September 2014, tenant Oddello Industries, LLC, (Oddello) agreed to lease a 408,000 square foot facility from landlord JTM Enterprises (JTM). The lease was for an eight-year period and provided that Oddello would pay $61,200 per month in rent, that the facility was to be improved, and that, upon completion of the improvements, Oddello would pay an unspecified monthly sum toward the costs of the improvements. Oddello drew seventy percent of its business from a contract with Tempur Sealy, and the lease provided that if Oddello's contract with Tempur Sealy were terminated, Oddello would have the option of early termination of the lease but would remain liable for the full cost of the remodeling. A second lease was executed in January 2015 that was to run through January 2023. This second lease provided that the monthly payments on construction costs would be $8,144.69, contributing to a total monthly payment of $69,344.69 for rent and construction costs. The early termination provision hinging on the loss of the Tempur Sealy contract remained intact.

The signatories to the leases were Gene Jolley, Managing Partner[1] of JTM, and Telia Otto, Chief Managing Member of Oddello. Mr. Jolley and Ms. Otto had a longstanding and amicable working relationship spanning multiple businesses and years. In late 2017, the unfortunate event anticipated by the contract — the loss of a contract with Tempur Sealy — took place. Oddello does not dispute that from November 2017 through August 2018, it did not pay any rent. However, Ms. Otto testified that Oddello could have exercised its option to terminate when it lost the contract with Tempur Sealy. She stated that Oddello attempted to terminate the lease and "did make JTM aware that we were going to move out," but that Oddello did not do so because she had a "good working relationship" with Mr. Jolley. According to Ms. Otto, Mr. Jolley forgave the rent for the ten-month period. She testified, "It was just an understanding and communicated between us in informal conversations that [rent] was forgiven for me to get back on my feet." She confirmed that Mr. Jolley used the word "forgiven" and said he did not use the word "waive." According to Ms. Otto, these conversations took place in early 2018. In addition to refraining from exercising the right to terminate, Oddello downsized its footprint to half the facility and attempted to get a new tenant for the remaining space. Oddello incurred costs in moving its equipment to the new space and in adding a $30,000 desk pad in the divided space.

On May 4, 2018, during the period of nonpayment, the parties executed a third lease. Under the third lease, Oddello would occupy 200,000 square feet of the 408,000-square-

---

[1] Mr. Jolley executed documents as "Partner," "General Partner," "Authorized Representative," and "Managing Partner" for JTM. At trial, witnesses for JTM described him as the "managing partner."

foot space and would pay $25,000 per month in rent. The term of the third lease began September 1, 2018, and the lease was for period of three years. Pursuant to a Lease Amendment executed on June 28, 2018, Oddello was to pay $4,500 per month for the balance of the construction costs. No provisions were made for the repayment of any past-due rent, although Oddello had not paid rent since the previous November.

The parties executed certain documents on May 29, 2018, related to a line of credit and a loan that Oddello sought from a financial institution. In these documents, the parties represented that Oddello was not in default under the lease. An agreement entitled "Landlord, Tenant and Lender Agreement" provided: "Landlord represents that, to the best of its knowledge, there are no Tenant defaults under the Lease as of the date hereof. Landlord agrees and Tenant consents that any default notice which is sent to Tenant shall also be sent to Lender." The Landlord's Waiver similarly represented that Oddello was not in default: "Landlord and Tenant each hereby ratify the Lease and represent and warrant to Lender that as of the date hereof (a) the Lease is in full force and effect in accordance with its terms, (b) neither Landlord nor Tenant is in default under the Lease, and (c) no event has occurred that, upon the giving of notice or the passage of time (or both), would become a default under the Lease."

JTM filed suit on December 30, 2019. According to the complaint, Oddello began missing payments about a year into the third lease, in November and December 2019. JTM sought possession of the premises, construction costs, and judgments for unpaid rent from November 2017 to August 2018 and from November and December 2019. JTM moved for default judgment on February 6, 2020, alleging that Oddello was served with the complaint on January 6, 2020, but that it had not filed an answer or other pleading. The trial court entered a default judgment on February 13, 2020, granting JTM possession of the premises and a judgment of $1,171,009.52, representing the unpaid rent and construction costs claimed by JTM.

On March 3, 2020, Oddello filed a motion to vacate the default judgment and an answer. In support of the motion to vacate, Oddello averred that after Ms. Otto learned of the lawsuit, she spoke numerous times on the telephone with Mr. Jolley, and that he several times told her "not to be concerned about it" and "that it could be worked out." Included as an exhibit was a log of numerous telephone calls Oddello stated occurred between Ms. Otto and Mr. Jolley. The motion asserted that Oddello had meritorious defenses based on the amounts owed and on JTM's failure to notify Oddello's lenders of default. JTM opposed the motion to vacate, noting that, although it acknowledged discussions between JTM's members and Oddello, the default motion was properly served and Odello failed to defend it. The trial court entered an order taking the motion to vacate under advisement, urging the parties to come to an agreement, and staying any action to enforce the judgment.

During a two-year pause in the proceedings, the parties settled the issues of possession, construction costs, and the 2019 rent, but they proceeded to trial over the

unpaid rent from November 2017 to August 2018. Before trial, the parties addressed the motion to vacate the default judgment, with Oddello noting that a judgment could be vacated when the default was unintentional, there was a meritorious defense, and no prejudice to the other party, and asking for the default to be set aside. The chancery court determined that it would set aside the default judgment, and trial proceeded on the issue of outstanding rent.

Unfortunately, Mr. Jolley had passed away by the time of trial. Mr. Jolley's son, Randall Jolley,[2] testified at trial as the trustee for Mr. Jolley's estate, which remained part owner of JTM. Mr. Jolley's son testified that he was present when Mr. Jolley signed the Landlord's Waiver and Landlord, Tenant and Lender Agreement in May 2018. He stated that the $2.5 million in loans referenced in the agreement was a "cash influx in the business to get them caught up on payments" and that he believed the money was to be used to pay the rent owed to JTM. Mr. Jolley's son testified that Oddello was behind on payments at the time that the Landlord, Tenant and Lender Agreement was executed. Nevertheless, Mr. Jolley signed the agreement because Mr. Jolley thought that, without the loan, Oddello would not be able to "stay open" and that "this was the best way for us to be able to get our rent paid back." Mr. Jolley's son believed Oddello would not have been able to obtain the loan if the lender had been aware that Oddello was approximately $500,000 behind on rent but stated that JTM did not intend to waive the rent owed at the time. Fascinatingly, Mr. Jolley's son stated that the representation in the Landlord's Waiver that Oddello was not in default was "not a true statement" and that the representation that there was no default in the Landlord, Tenant and Lender Agreement was likewise "not a true statement."[3] He testified that Mr. Jolley signed the documents because he was worried that JTM "wouldn't get any money" if Oddello went out of business. On redirect examination, he agreed that the third lease, which went into effect in September 2018, was not in default at the time the May 2018 lender documents were signed, but he also testified he did not know which lease was referenced in the May 2018 lender documents.

On cross-examination, Mr. Jolley's son testified that he had "been involved" in the business for ten to fifteen years but that he did not have a title or receive a salary. His duties were "[j]ust to help [Mr. Jolley] with the paperwork and the tenants" and to resolve "whatever issues there were." Mr. Jolley's son agreed that Mr. Jolley "had authority to bind the partnership" and that he was the signatory on the documents at issue. He acknowledged that the third lease, executed in May 2018, made no provisions for the

---

[2] To avoid confusion, we refer to Gene Jolley as "Mr. Jolley" and to Randall Jolley as "Mr. Jolley's son." We intend no disrespect in doing so.

[3] At closing argument, JTM's attorney stated regarding the lender documents, "In response to what [counsel] just said, I mean, how many times does Your Honor see, and do we see, you know, people filling out their personal financial statements, you know. And, yes, those are you sign and you say this is true and correct but, you know, is there some inflation on values of things, things like that. And, again, they signed this so that they could get $2.5 million and continue to stay in the business."

- 4 -

payment of any past-due rent. He likewise acknowledged that JTM did not file suit seeking the past-due rent until December 2019.

Ms. Otto testified that the Landlord's Waiver and the Landlord, Tenant and Lender Agreement were executed in connection with a refinancing of pre-existing loans and that Oddello did not receive cash from either loan. She further noted that such waivers were standard and that Mr. Jolley had signed previous, similar waivers in connection with her refinancing. She testified that she never had a conversation with Mr. Jolley or his son indicating that Oddello would use a loan to repay the past-due rent and that she did not recall a meeting with Mr. Jolley and his son regarding the lending documents. Ms. Otto did not believe Oddello was in default at the time the documents were executed because the rent had been forgiven.

Harold Nichols, a partner at JTM, testified that Mr. Jolley and the other partners had regular meetings and that Mr. Jolley would not have waived the rent "without some partnership agreement on it." Mr. Nichols acknowledged that Mr. Jolley was the managing partner but stated, "[A]ny decision to give away a half a million dollars, he wouldn't have taken it on himself without consulting us first." He further testified that the partners would not have agreed to it. The partners at JTM had "many conversations about the rent being owed and why we hadn't evicted them." Mr. Nichols was not aware that the Landlord's Waiver and the Landlord, Tenant and Lender Agreement had been signed, nor had he ever had any contact with Ms. Otto. According to Mr. Nichols, Mr. Jolley felt that Oddello would pay. He stated that there was never any decision regarding what action JTM should take regarding the nonpayment. Mr. Nichols understood "that they were going to move into half of the building. We were going to try to lease it and we were going to reduce their rent down to $25,000 until they could get back on their feet and they would start paying the other rent and go from there." He testified that Mr. Jolley would not have forgiven the rent entirely and at worst would have reduced it to $25,000. He believed JTM was merely permitting a delay in payment. The building was rented to another tenant at the time of trial.

At the conclusion of proof, Oddello argued that JTM was estopped from denying the forgiveness of rent, as Oddello had refrained from terminating the lease and invested in remodeling for a new tenant. JTM argued that Oddello owed ten months of unpaid rent.

In its written order, the chancery court found that Oddello failed to pay rent for a period of ten months. The court found that Mr. Jolley "made an oral agreement with a representative of [Oddello] to modify the payment terms, but that he did not have the authority to waive the entire amount of rent owed." Accordingly, the court stated it was giving Oddello a $36,000 credit for three months of unpaid rent,[4] and ordered Oddello to

---

[4] The trial court was attempting to apply the rental rate of $25,000 per month from the 2018 lease rather than the rental rate of $61,200 per month from the 2015 lease to the three months after the signing of

pay JTM $504,000 with post-judgment interest.[5]  The chancery court did not explicitly address the estoppel argument or the argument that the lending documents operated as an explicit waiver.

On appeal, Oddello argues that the chancery court erred in concluding that Mr. Jolley had the authority to modify but not waive the rent, erred in failing to find that JTM was estopped from seeking the ten months' rent, and erred in failing to find that the lender documents operated as an explicit waiver of rent.  JTM asserts that the default judgment should never have been set aside, that Mr. Jolley had no authority to waive the rent, that the modification of the lease was for a delay rather than reduction of the rent, and that the chancery court did not err in its rulings regarding estoppel or waiver.

## II.

A trial court's findings of fact in a civil action are reviewed de novo on the record, accompanied with a presumption of correctness, unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d); *Lovlace v. Copley*, 418 S.W.3d 1, 16 (Tenn. 2013).  Questions of law are reviewed de novo with no presumption of correctness.  *Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 142 (Tenn. 2017).  The interpretation of a statute is a question of law reviewed de novo.  *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 533 (Tenn. 2004).

## III.

Given its foundational nature, we turn first to JTM's contention that this case should have ended with the maintenance of the default judgment entered against Oddello.  JTM argues that the court failed to follow the Tennessee Rules of Civil Procedure and that it abused its discretion in setting the default judgment aside.  Oddello responds that the trial court did not abuse its discretion because, according to Ms. Otto's testimony, Mr. Jolley repeatedly reassured her that he would "tak[e] care of" the lawsuit.

Under Tennessee Rule of Civil Procedure 55.02, "[f]or good cause shown the court may set aside a judgment by default in accordance with Rule 60.02."  *See also* Tenn. R. Civ. P. 55.01 (regarding entry of default judgment).  Rule 60.02, in turn, permits a court to relieve a party from a final judgment on the basis of:

> (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other

---

the 2018 lease in May but prior to it taking effect in September.  The actual difference between the rent due under the second and third leases is $36,200 per month.  Neither party has noted this mathematical error.

[5] The parties entered a stipulation for a stay of execution to explore post-judgment settlement.

misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment.

Tenn. R. Civ. P. 60.02.

In this case, the motion to vacate was filed on March 3, 2020, prior to the time that the default judgment entered on February 13, 2020, became final. Accordingly, the motion to vacate "should be deemed a motion to alter or amend" under Tennessee Rule Civil Procedure 59.04. *Pryor v. Rivergate Meadows Apartment Associates Ltd. P'ship*, 338 S.W.3d 882, 885 (Tenn. Ct. App. 2009) (citing *Henson v. Diehl Machines, Inc.*, 674 S.W.2d 307, 310 (Tenn. Ct. App. 1984) (noting that Rule 60.02 concerns relief from final judgments)); *see Discover Bank v. Morgan*, 363 S.W.3d 479, 489 (Tenn. 2012) ("Thus, for thirty days after entry of a final judgment, motions for relief should be premised upon Rule 59."). In any event, "[w]hether brought under Rule 59 or Rule 60, the standard for reviewing the motion is the same because of Rule 55.02." *Pryor*, 338 S.W.3d at 885 (citing *Estate of Vanleer v. Harakas*, No. M2001-00687-COA-R3-CV, 2002 WL 32332191, at *4 n. 5 (Tenn. Ct. App. Dec. 5, 2002)).

A decision to set aside a default judgment is reviewed for abuse of discretion. *Parks v. Mid-Atl. Fin. Co., Inc.*, 343 S.W.3d 792, 798 (Tenn. Ct. App. 2011) ("We have held that the decision whether or not to grant a default judgment as well as the decision whether to grant relief from a default judgment is reviewed for abuse of discretion."); *Patterson v. SunTrust Bank*, 328 S.W.3d 505, 509 (Tenn. Ct. App. 2010). A ruling on a motion to alter or amend under Rule 59.04 is likewise reviewed for abuse of discretion. *Robinson v. Currey*, 153 S.W.3d 32, 38 (Tenn. Ct. App. 2004). The burden of proof rests with the party seeking to set aside the judgment. *Henry v. Goins*, 104 S.W.3d 475, 482 (Tenn. 2003); *see Discover Bank*, 363 S.W.3d at 491. Appellate courts will set aside a discretionary decision by a trial court "only when the court that made the decision applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008). "If a discretionary decision is within a range of acceptable alternatives," a Tennessee appellate court "will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative." *Royal Properties, Inc. v. City of Knoxville*, 490 S.W.3d 1, 7 (Tenn. Ct. App. 2015); *Riad v. Erie Ins. Exch.*, 436 S.W.3d 256, 266 (Tenn. Ct. App. 2013).

A default judgment is a "drastic sanction[]" disfavored by courts as running "counter to the judicial system's general objective of disposing of cases on the merits." *Henry*, 104 S.W.3d at 481. Requests to set aside a judgment are construed "much more

- 7 -

liberally in cases involving default judgment than in cases following a trial on the merits." *Id.* "A request to vacate a default judgment in accordance with Rule 60.02 should be granted if there is reasonable doubt as to the justness of dismissing the case before it can be heard on its merits." *Id.*

In this case, the briefing on appeal and the arguments before the trial court clarify that Oddello seeks relief under Rule 60.02(1): mistake, inadvertence, surprise or excusable neglect. *See Pryor*, 338 S.W.3d at 885 ("Rivergate's motion to set aside the default judgment mentions Rule 60.02 but does not specify the subpart of the Rule on which it relies. Rivergate's brief, along with counsel's statements at oral argument, make it clear that Rivergate seeks relief under Rule 60.02(1)."); *see also Henry*, 104 S.W.3d at 479 (observing that the parties did not mention what Rule they were relying on but that it was apparent they were proceeding under Rule 60.02(1)). Like relief under Rule 60.02(1), relief under Rule 59.04 may be premised on mistake, inadvertence, surprise, or excusable neglect. *Campbell v. Archer*, 555 S.W.2d 110, 112 (Tenn. 1977); *Pryor*, 338 S.W.3d at 885 (citing *Henson*, 674 S.W.2d at 310); *see Henry*, 104 S.W.3d at 480 ("Although Rule 59.04 and Rule 60.02 are distinct, there is considerable overlap between them."). A default judgment is analogous to a dismissal for failure to prosecute. *Henry*, 104 S.W.3d at 481. Accordingly, when evaluating a motion to set a judgment aside based on mistake, inadvertence, surprise or excusable neglect, a court considers the following factors: "(1) whether the default was willful; (2) whether the defendant has a meritorious defense;[6] and (3) whether the non-defaulting party would be prejudiced if relief were granted." *Id.*

Willfulness is a threshold inquiry. *Discover Bank*, 363 S.W.3d at 493-94. While understanding the concept of willfulness in the context of excusable neglect requires some mental gymnastics, courts have attempted to define willful conduct as conduct based on deliberate choices or conduct which is flagrant and unexplained. *Discover Bank*, 363 S.W.3d at 493 (quoting *Barber & McMurry, Inc. v. Top-Flite Dev. Corp.*, 720 S.W.2d 469, 471 (Tenn. Ct. App. 1986); *Hayes v. Hayes*, No. M2006-02356-COA-R3-CV, 2007 WL 2580026, at *2 (Tenn. Ct. App. Sept. 6, 2007)). "In the context of Rule 60, willful conduct refers to 'strategic decision[s] to default,' 'conduct that is more than merely negligent or careless,' and 'conduct that is egregious and not satisfactorily explained.'" *Howes v. Swanner*, No. M2016-01892-COA-R3-CV, 2017 WL 2192065, at *5 (Tenn. Ct. App. May 17, 2017) (quoting *McBride v. Webb*, No. M2006-01631-COA-R3-CV, 2007 WL 2790681, at *3 (Tenn. Ct. App. Sept. 25, 2007)) (internal quotation marks omitted).

Accordingly, the trial court had to consider whether Oddello's failure to answer was

---

[6] JTM argues that "[w]hether or not the movant has a meritorious defense to the underlying lawsuit is irrelevant" and cites to *H.G. Hill Realty Co., L.L.C. v. Re/Max Carriage House, Inc.*, for support. 428 S.W.3d 23, 38 (Tenn. Ct. App. 2013). However, *H.G. Hill Realty Co.* noted that the existence of a meritorious defense was a factor to be considered, and the outcome instead rested on the court's determination that the party's willfulness defeated the attempt to set aside the judgment. *Id.* at 37-38.

willful, whether it presented a meritorious defense, and whether there was prejudice to JTM. Here, Oddello argued that its failure to answer was not willful because the parties had a long history of cooperation and because Mr. Jolley continued to represent to Ms. Otto that the lawsuit "could be worked out" and that she did not need to "be concerned about it."[7] We cannot say it was an abuse of discretion to find that Oddello's conduct was not flagrant, egregious, unexplained, or strategic. *See Campbell*, 555 S.W.2d at 113 (defendants missed the bulk of trial due to mistake, inadvertence, or excusable neglect, rather than willful failure to appear, when their prior attorney and his office staff failed to note trial date); *Kirk v. Kirk*, 447 S.W.3d 861, 869 (Tenn. Ct. App. 2013) ("[T]he relief sought by Wife based on the newly discovered evidence of Husband's alleged misrepresentations and concealment of assets could also have been the basis for relief under Rule 59.04."); *cf. Discover Bank*, 363 S.W.3d at 495 (failure to answer a counter-complaint for more than a year and failure to file an answer for nine months after entry of default was a flagrant violation of procedural rules). Oddello also presented defenses at trial: that Mr. Jolley, JTM's agent, forgave the rent; that JTM was estopped from collecting back rent because Oddello refrained from exercising its termination rights based on Mr. Jolley's representations; and that JTM had waived back rent by signing the lending agreements.[8] Finally, JTM asserts as prejudice the passage of time. However, Oddello's motion was filed less than three weeks after the default judgment. The delay to which JTM objects, a two-year pause in the proceedings for settlement, occurred after the filing of the motion and cannot be attributed to any inaction by Oddello. Moreover, it does not appear that JTM presented an argument regarding prejudice to the trial court. *See Powell*, 312 S.W.3d at 511.

Here, the chancery court considered Oddello's arguments on the factors set forth above, noted the preference of courts for disposition of cases on the merits, *see Henry*, 104 S.W.3d at 481, and determined that it would set the default judgment aside. We see no abuse of discretion in the chancery court's determination. Accordingly, JTM is not entitled to relief on this basis.[9]

---

[7] In a footnote, Oddello raises for the first time on appeal an argument that notice of the hearing on the motion for default judgment was inadequate because the motion was heard seven days after it was filed but Oddello was entitled to eight business days' notice under Rules 55.01 (requiring five days' notice for default), 6.05 (adding three days to the service period when service is by mail), and 6.01 (excluding weekends from periods of time less than eleven days) of the Tennessee Rules of Civil Procedure. Because this argument is raised for the first time on appeal, we do not address it. *See Powell v. Cmty. Health Sys., Inc.*, 312 S.W.3d 496, 511 (Tenn. 2010) ("It is axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court.").

[8] As noted *infra*, there was no ruling on some of these issues, and some hinge on credibility determinations, but these defenses are certainly "potentially meritorious." *See Sauer v. Launius*, No. E2010-00477-COA-R3-CV, 2011 WL 334982, at *3 (Tenn. Ct. App. Jan. 31, 2011) (defendant had put forth "potentially meritorious" defenses).

[9] We note that the trial court, prior to ruling on the motion to set aside the default judgment, ordered the execution of the judgment stayed and the parties to engage in settlement negotiations. The parties agree

IV.

The chancery court's holding hinged primarily on its conclusion that Mr. Jolley had the authority to modify the contract but did not have the authority to waive rent. Accordingly, the court found that Mr. Jolley entered into an oral modification to reduce Oddello's rent to $25,000 for the period of time following the execution of the third lease in May 2018. However, the court found he did not have the authority to forgive the rent entirely. Oddello asserts that Mr. Jolley had the authority to act for JTM and that the court erred in concluding his authority did not extend to waiving rent entirely. JTM, on the other hand agrees with the chancery court that there was an oral modification of the lease but that Mr. Jolley had no authority to forgive rent. It disputes, however, that the oral modification consisted of lowering the rent for a period of three months; instead, it asserts that the modification was simply a delay in the due date of the rent owed.

On appeal, Oddello cites to provisions of the Revised Uniform Partnership Act, Tennessee Code Annotated section 61-1-101 et seq., for the proposition that Mr. Jolley had authority to bind JTM.[10] Oddello notes that the complaint alleged that JTM is a general partnership. *See* Tenn. Code Ann. § 61-1-101(7) ("'Partnership' means an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit formed under § 61-1-202, predecessor law, or comparable law of another jurisdiction."). Oddello argues that Mr. Jolley's actions are binding on the partnership under the statute, which states:

> (1) Each partner is an agent of the partnership for the purpose of its business. An act of a partner, including the execution of an instrument in the partnership name, for apparently carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership, unless the partner had no authority to act for the partnership in the particular matter and the person with whom the partner was dealing knew or had received a notification that the partner lacked authority;

that issues related to possession of the property, repayment of remodeling costs, and payment of rent from November and December 2019 have been resolved. However, the record does not reveal the manner in which these issues were resolved, and how their resolution would affect the default judgment in favor of JTM for $1,171,009.52. For instance, it is not clear whether Oddello paid the full amounts claimed under the complaint for these items or whether the parties negotiated for some other sum. Because we conclude that the court did not err in setting aside the default judgment, we do not reach the effect of the settlement on JTM's argument that this court should enforce a default judgment when that judgment had already been partially resolved through settlement.

[10] At trial, JTM's witness, Mr. Jolley's son, testified that Mr. Jolley had "authority to bind the partnership," and the parties did not contest the issue of his authority. The parties agree on appeal that the statute applies. Consequently, we examine Mr. Jolley's authority in light of the statute.

(2) An act of a partner which is not apparently for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners.

Tenn. Code Ann. § 61-1-301; *see* Tenn. Code Ann. § 61-1-306(a) ("Except as otherwise provided in subsections (b)-(g), all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."); *see also* Rev. Uniform Partnership Act § 301 (2023-2024 ed.).

Under the Uniform Partnership Act, "a partner's status as a partner, without more, creates complete agency authority with respect to acts within the apparent scope of the partnership business." Partnership Law & Practice § 8:2 (2022-2023). This is because "by virtue of partnership status, each partner has apparent authority to bind the partnership in ordinary course transactions." Tenn. Code Ann. § 61-1-301, Uniform Law Cmt. 2; *see Dexter Ridge Shopping Ctr., LLC v. Little*, 358 S.W.3d 597, 609 (Tenn. Ct. App. 2010) ("If a principal has cloaked an agent with apparent authority to act on behalf of the principal, then the principal is estopped from denying liability for the acts of the agent when the agent exercises that authority. The principal will not be deemed responsible for the acts of the putative agent where only the agent's own conduct has created the appearance of agency." (citations omitted)); *see also Holman v. Higgins*, 183 S.W. 1008, 1010 (Tenn. 1916) ("A concomitant of the doctrine of implied authority . . . is the application of the principle that when one of two innocent persons must suffer, the loss should fall on that one who reposed confidence in him who perpetrated the wrong."). Here, the testimony from JTM was that Mr. Jolley was the managing partner. Mr. Jolley executed the leases and lending documents as "Partner," "General Partner," "Authorized Representative," and "Managing Partner" for JTM. Mr. Jolley was Oddello's point of contact with JTM. Ms. Otto testified, "Gene [(Mr. Jolley)] is the only person at JTM I ever spoke with about banking." Mr. Nichols never had a conversation with Ms. Otto, and he testified that he and another partner had "no relationship" with Ms. Otto. JTM's witnesses testified that Mr. Jolley "had authority to bind the partnership." We conclude that Mr. Jolley had the authority to bind the partnership in matters within the ordinary course of the business. *See In re Seventh Ave. Props.*, No. 312-08678, 2013 WL 655871, at *4 (Bankr. M.D. Tenn. Feb. 22, 2013) (general partner had the authority to borrow funds when the other partners had permitted him to run the day-to-day operations and the creditor had no notification that the partner did not have authority to act on behalf of the partnership).

JTM argues that waiver of rent was not in the ordinary course of JTM's business; it was only the collection of rent, JTM asserts, which lay in its ordinary course. We disagree. *See generally Restatement (Third) Of Agency* § 7.08 Reporter's Note (b) (2006) ("In the partnership context, a partner's power to impose liability on the partnership through a wrongful act or omission is limited to acts or omissions of a partner 'acting in the ordinary

course of business of the partnership or with authority of the partnership.'" (quoting Rev. Unif. Partnership Act § 305(a))). "[A] transaction occurs in the ordinary course when there is a showing that the transaction is the sort occurring in the day-to-day operation of the debtor's business, or businesses like it." *In re Copeland*, 291 B.R. 740, 779, (Bankr. E.D. Tenn. 2003) (quoting *United States ex rel. Harrison v. Estate of Deutscher* (*In re H & S Transp. Co., Inc.*), 115 B.R. 592, 598 (M.D. Tenn. 1990)). "Acts that have been considered not apparently usual in general partnerships include those that are commonly considered ultra vires in corporations: guarantees in the partnership name of the debts of another, transactions benefiting individual partners, and charitable or gratuitous undertakings."[11]  1 Ribstein and Keatinge on Ltd. Liab. Cos. § 11:5.  On the other hand, "[a]cts that have been considered apparently usual in general partnerships include borrowing money, issuing negotiable instruments, entering into employment contracts, purchasing property, and paying or acknowledging claims." *Id.*  Generally, entering agreements with customers related to the partnership's business, receiving payments, recovering property owed to the partnership, compromising claims, and conducting ordinary banking activities fall within the ordinary course of business.[12]  12 Bus. & Com. Litig. Fed. Cts. § 133:28 (5th ed.); *see Bufton v. Hoseley*, 386 P.2d 471, 472 (Or. 1963) (both partners were bound when one partner absolved the defendants of rent in exchange for quitting the premises).  Part of JTM's business was apparently negotiating lease agreements with tenants.  There is nothing in the record to indicate that negotiating with a tenant who was seeking to terminate a lease under an early-termination provision lay outside the ordinary course of the business.

JTM asserts that because it is a partnership, a partner's unilaterally waiving rent was not in the ordinary course of its business.  A similar argument was made in *Strickland v. Crowell*, No. 01-A-01-9005CH00167, 1990 WL 170441, at *3 (Tenn. Ct. App. Nov. 7, 1990).  There, the partnership asserted that the partner's acts of lying about a permit and

---

[11] *See*, *e.g.*, *Morristown Heart Consultants, PLLC v. Patel*, No. E2018-01590-COA-R9-CV, 2019 WL 3318184, at *6 (Tenn. Ct. App. July 24, 2019) (concluding that, under the similar language of the statute governing LLCs, the act of one partner in hiring an attorney to represent the partnership against the other partner was not in the ordinary course of business); *In re Copeland*, 291 B.R. 740, 780 (Bankr. E.D. Tenn. 2003) (generally, the sale of a business does not occur in the ordinary course of that business); *In re Sikes*, 184 B.R. 742, 746 (Bankr. M.D. Tenn. 1995) (citing cases in which torts such as arson were found not to be in the ordinary course of business); *see also Goodman v. Holmes & McLaurin Attorneys at Law*, 665 S.E.2d 526, 533 (N.C. Ct. App. 2008) (firm was not responsible for fraudulent conduct in concealing negligence, although representing plaintiff in personal injury suit was within the ordinary course of business); *Doctors Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 548 (Tex. 2016) (illegally practicing medicine was not in the ordinary course of business).

[12] *Husted v. McCloud*, 450 N.E.2d 491, 494 (Ind. 1983) (request for and acceptance of money related to estate tax liability was in the course of the partnership's business and partnership was responsible "even though fraud and conversion of a client's funds are not part of the ordinary course of a law partnership's business"); *Casey Ranch Ltd. P'ship (CRLP) v. Casey*, 773 N.W.2d 816, 822-23 (S.D. 2009) (decision to sue was within the ordinary course of business); *Helpinstill v. Regions Bank*, 33 S.W.3d 401, 404 (Tex. App. 2000) (although kiting scheme was not in the ordinary course of business, overdrafts were and the partnership was responsible).

license, writing bad checks, and abandoning work were not in the usual way of business.[13] *Id.* This court rejected the argument, noting that the company was a construction company and that "[w]hile [the partner's] actions were not those of a good or prudent businessman, there is no showing that his dealings with the plaintiffs were outside the scope of his authority to act." *Id.*; *see also Tennessee Traders Landing, LLC v. Jenkins & Stiles, LLC*, No. E2017-00948-COA-R3-CV, 2018 WL 3343592, at \*2 (Tenn. Ct. App. July 9, 2018) (holding when the lessor's president and tenant agreed to rescind the lease that summary judgment to the lessor was inappropriate because the lessor had "not presented sufficient evidence demonstrating that [its president] had no authority to act on behalf of" the lessor; however, summary judgment for the tenant under the similarly-worded LLC statute[14] was also not appropriate because the tenant's agent had been a member of the lessor's LLC and may have had notice of limits on the lessor's president's authority).

We conclude that the trial court erred in determining that Mr. Jolley did not have authority to waive the rent. Under the Revised Uniform Partnership Act, Mr. Jolley's actions bound the partnership for acts carrying on "in the ordinary course the partnership business" unless he had no authority and Oddello knew or had notification he had no authority. Tenn. Code Ann. § 61-1-301. While JTM may not have routinely waived rent for its tenants, renegotiating a lease in order to prevent a tenant from exercising its right to terminate was certainly within the ordinary course of JTM's business. Furthermore, the trial court found that Mr. Jolley did have the authority to renegotiate or reduce the rent. Ms. Otto testified that Mr. Jolley was her point of contact with JTM, that they spoke

---

[13] At the time, Tennessee Code Annotated section 61-1-108 governed partnerships, and it stated that:

> Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member, binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

*Strickland*, 1990 WL 170441, at \*2-3 (quoting Tenn. Code Ann. § 61-1-108(a)); *see  Karns v. Loftis*, 1 Tenn. App. 574, 580-81, 1925 WL 1917, at \*5-6 (1925) (the uniform partnership act, Acts 1917, chapter 140, provided that "[e]very partner is an agent of the partnership for the purpose of its business, and the acts of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership . . ."); *see also* Rev. Uniform Partnership Act § 301 (2023-2024 ed.) (noting that the prior act contained "a list of five extraordinary acts that require unanimous consent of the partners before the partnership is bound" but that the revised act "leaves it to the courts to decide the outer limits of the agency power of a partner").

[14] "[T]he president is an agent of the LLC for the purpose of its business, and an act of the president, including the signing of an instrument in the LLC's name, that is apparently for carrying on in the ordinary course the LLC's business, or business of the kind carried on by the LLC binds the LLC, unless the president had no authority to act for the LLC in the particular matter, and the person with whom the president was dealing knew or had notice that the president lacked authority." Tenn. Code Ann. § 48-249-402(d).

frequently, and that after the loss of the Tempur Sealy contract, Mr. Jolley told her that he would forgive the rent. The parties contemporaneously negotiated a new lease which would take effect in September 2018 for a reduced space. There was no testimony at trial that Ms. Otto was ever made aware that there were limits on Mr. Jolley's authority to negotiate with Oddello to prevent Oddello's terminating the lease. Accordingly, the trial court erred when it concluded that there were such limits.

The trial court, having held that there was no authority to waive rent, never made an explicit finding regarding whether Mr. Jolley actually forgave the rent. Ms. Otto testified that Mr. Jolley forgave the entirety of the rent. JTM, during the period of nonpayment, filled out the lender documents, representing that there was no default and no event that could constitute default under the lease, which was in full force and effect. There was no provision for payment of past-due rent in the new lease, and no demand was made for the rent until December 2019. Mr. Nichols, on the other hand, testified that Mr. Jolley would not have waived the rent "without some partnership agreement on it" and that "any decision to give away a half a million dollars, he wouldn't have taken it on himself without consulting us first." He stated the partnership would not have agreed to it. The trial court made no finding on the factual question of whether Mr. Jolley in fact represented to Ms. Otto that rent would be waived for an indefinite period prior to the reduced rental agreement taking effect in September 2018. We remand to the trial court to make appropriate factual findings in light of the fact that Mr. Jolley, under statute, had the authority to bind the partnership in matters related to lease agreements.[15]

V.

Oddello also asserts that the chancery court erred in its determinations regarding whether JTM was estopped from demanding the ten months' rent by Oddello's reliance on its previous statements that rent was waived. JTM argues that estoppel does not apply because, had Oddello terminated the lease after the loss of Tempur Sealy, it would have been liable for the construction costs and because delaying the assertion of a right is not itself estoppel. We conclude the trial court erred in pretermitting this issue.

The doctrine of estoppel acknowledges the existence of a legal right in the other party but provides that the other party's conduct prevents it from enforcing that right. *Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-CV-02482-TLP-CGC, 2021 WL 4887984, at *10 (W.D. Tenn. Oct. 19, 2021) (citing *E & A Ne. Ltd. P'ship v. Music City Record Distribs., Inc.*, No. M2005-01207-COA-R3CV, 2007 WL 858779, at *7 (Tenn. Ct. App. Mar. 21, 2007)). Equitable estoppel requires proof of the following elements with respect to the party alleged to be estopped:

---

[15] JTM also devotes half a paragraph to arguing there was no meeting of the minds in any contract modification. Oddello notes that this issue was not raised at trial. We conclude that this issue is not before us.

- 14 -

(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts.

*Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004) (quoting *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990)). In addition, the party asserting estoppel must demonstrate:

(1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially.

*Id.* (quoting *Hite*, 801 S.W.2d at 825).

At trial, Oddello introduced proof that it had the option to terminate the lease when it lost its largest client, Tempur Sealy. Oddello also introduced proof, in the form of Ms. Otto's testimony, that it intended to exercise its option. Ms. Otto testified that Oddello attempted to terminate the lease and that Oddello "did make JTM aware that we were going to move out." According to Ms. Otto, Oddello chose to stay based on Mr. Jolley's representation that rent would be forgiven. Oddello argues that it could have mitigated its damages by terminating the lease had it not relied on Mr. Jolley's statement that the rent was forgiven. Oddello asserts that these facts are sufficient to establish that Mr. Jolley's conduct was inconsistent with JTM's subsequent assertions that the rent was due, that Mr. Jolley intended Oddello to forgo terminating the lease, and that JTM knew that it did not intend to forgive the rent. Oddello asserts that the evidence also shows that Oddello had no means to know that JTM would subsequently claim rent, that it relied on Mr. Jolley's representations, and that it sustained damages by not terminating the lease.

JTM argues that it was merely delaying asserting its rights and that "[m]ere delay in asserting a legal right does not of itself work an estoppel." *E & A Ne. Ltd. P'ship*, 2007 WL 858779, at *8. (quoting *Johnson v. De Soto Hardwood Flooring Co.*, 67 S.W.2d 143, 144 (Tenn. 1934)). JTM cites to *Haun v. Corkland*, in which the court addressed not estoppel but the requirement of consideration for an oral modification of a lease. 399 S.W.2d 518, 520-21 (Tenn. Ct. App. 1965) (concluding that the tenant's act of forgoing its right of termination was adequate consideration). JTM attempts to distinguish *Haun* by noting that in this case, there was no written agreement to forgive the rent and that there was testimony that the building was occupied at the time of trial. *See id.* at 521 (noting that the landlord faced the choices of reducing the rent, being left with an empty building

- 15 -

that may have been difficult to rent, or the "vexations of suit" and that the landlord may have preferred a tenant at the reduced rate). Oddello argues that JTM has waived the consideration argument and observes that consideration is not an element of estoppel but relates to contract modification.

The chancery court made no ruling on the estoppel issue, despite the fact that it found that JTM's agent did not have the authority to forgive the past-due rent. "Determination of whether a party may rely on equitable estoppel requires a significant fact-based inquiry." *Domus Dev. LLC v. Titan Dev. LLC*, 350 F. Supp. 3d 683, 690, 2018 WL 6169229 (M.D. Tenn. 2018). Given its conclusion that Mr. Jolley had no authority to forgive the rent, the court erred in pretermitting the issue. On remand, if the trial court determines that rent was not forgiven, it should determine whether Mr. Jolley made statements that induced Oddello to forgo exercising its option of early termination, and whether JTM is estopped on this basis from seeking past-due rent from the time the statements were made, which was in "early 2018."[16]

## VI.

The chancery court likewise did not rule on the waiver issue. Oddello argues that the execution of the lending documents operated as explicit waiver of the right to seek unpaid rent, pointing to the title of the "Landlord Waiver" document. JTM insinuates that the lending documents stated Oddello was not in default because Oddello was not in default of the 2018 lease, which was set to begin approximately three months after the signing of the lending documents. On the other hand, the lending documents represented that a lease was "in full force and effect," that there were "no Tenant defaults," and that no event had occurred which could constitute default on notice or passage of time. The chancery court found there was no default because of an oral modification to delay rent. However, there was no testimony that the parties came to an agreement regarding when rent would be due, and it appears that an event had occurred which, "upon the giving of notice or the passage of time (or both), would become a default under the Lease."

The chancery court made no finding regarding waiver. On remand, if the trial court determines that rent was not forgiven, it should likewise make a determination on the issue of waiver. *See GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 202 (Tenn. Ct. App. 2010) (quoting *E & A Ne. Ltd. P'ship*, 2007 WL 858779, at \*7).

## VII.

For the aforementioned reasons, the judgment of the Chancery Court for Hamblen

---

[16] Although the parties do not make the distinction, we note that the potential estoppel would only affect claims for rent that was due after Mr. Jolley made any statements that rent would be forgiven and after Oddello refrained from terminating on this basis.

County is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion. Costs of the appeal are taxed to the appellee, JTM Enterprises, for which execution may issue if necessary.


_____
JEFFREY USMAN, JUDGE